Alexis Milton EDWARDS, Petitioner–Appellant,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent–Appellee.

Eva Trinidad FALCONI Petitioner–Appellee,

v.

Immigration and Naturalization Service, Respondent–Appellant.

Docket Nos. 03–2292, 03–2104.

United States Court of Appeals, Second Circuit.

Argued: July 14, 2004.

Decided: Dec. 17, 2004.

Marjorie M. Smith (Englander & Smith, of counsel), Tappan, NY, for Petitioner–Appellant Edwards, No. 03–2292.

Steven Kim, Assistant United States Attorney for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York (F. Franklin Amanat, Varuni Nelson, Assistant United States Attorneys, of counsel), Brooklyn, NY, for Respondent–Appellee, No. 03–2292.

Anjan Sahni, Wilmer, Cutler & Pickering (Paul A. Engelmayer, on the brief), New York, NY, for Petitioner–Appellee Falconi, No. 03–2104.

Steven Kim, Assistant United States Attorney for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York (Varuni Nelson, Kristen Chapman, Assistant United States Attorneys, of counsel), Brooklyn, NY, for Respondent–Appellee, No. 03–2104.

Before: CALABRESI and SOTOMAYOR, Circuit Judges, and HALL, District Judge.*

CALABRESI, Circuit Judge.

These cases, which we address together, raise the question of whether aliens who were erroneously denied the opportunity to apply for § 212(c) relief, should be barred from seeking such relief as a result of their subsequent accrual of five or more years of imprisonment on one or more aggravated felony offenses. We conclude

---

* The Honorable Janet C. Hall, United States District Judge for the District of Connecticut, sitting by designation.

that Petitioners' applications for § 212(c) relief should be judged by the Executive Office for Immigration Review ("EOIR")[1] *nunc pro tunc*, that is, as if the Petitioners had not yet accrued five years' imprisonment. Because we hold that it would be appropriate to award Petitioners equitable relief, we do not decide the issue of whether § 212(c), as a matter of statutory interpretation, compels the same result.

## I. BACKGROUND

### A. Statutory History

Prior to the amendment of the immigration laws in 1996, section 212(c) of the Immigration and Nationality Act ("INA") afforded one of the most important forms of relief available to aliens facing deportation.[2] As it existed over much of its history, § 212(c)[3] relief was potentially available to most long-term legal residents of the United States, including many who were criminal aliens. *See* 8 U.S.C. § 1182(c) (1995) (repealed 1996). For a significant number of such aliens, a § 212(c) waiver constituted the only possible way of securing relief from deportation. *United States v. Copeland,* 376 F.3d 61, 73 (2d Cir.2004). In recognition of the importance of § 212(c) relief to aliens fac-

ing deportation, we have held that the erroneous denial of the opportunity to apply for § 212(c) relief may render deportation proceedings "fundamentally unfair." *Id. at* 75.

In 1990 and again, in 1996, Congress limited the availability of § 212(c) relief. In 1990, Congress restricted the category of aggravated felons eligible for § 212(c) relief to those who had not served five or more years in prison on their aggravated felony offense. *See* Immigration Act of 1990 ("IMMAct"), Pub.L. No. 101–649, § 511(a), 104 Stat. 4978, 5052 (1990). In 1996, in § 440(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Congress excluded aggravated felons altogether from the class of those eligible for § 212(c) relief. Pub.L. No. 104–132, § 440(d), 110 Stat. 1214 (1996). Shortly thereafter, in the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Congress replaced § 212(c) relief with a new form of discretionary relief known as "cancellation of removal,"[4] for which aggravated felons are not eligible. Pub.L. No. 104–208, § 304(b), 110 Stat. 3009–546 (1996) (codified at 8 U.S.C. 1229b).

1. The Executive Office for Immigration Review is the office within the Department of Justice that is responsible for the administrative adjudication of immigration cases. The trial and appellate entities responsible for adjudicating deportation proceedings are located within the EOIR.

2. Although § 212(c) facially applies only to exclusion proceedings, it has long been construed as affording a basis for relief in deportation proceedings as well. *See Francis v. INS,* 532 F.2d 268, 270–73 (2d Cir.1976).

3. Section 212(c) is the direct statutory descendant of a form of relief known as "the Seventh Proviso." *INS v. St. Cyr,* 533 U.S. 289, 307 n. 30, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *see also Matter of S-,* 6 I. & N. Dec.

392, 394–96 (BIA 1954), *approved* 6 I. & N. Dec. at 397 (A.G.1955) (discussing the modifications made by Congress in recodifying the Seventh Proviso as § 212(c) in the Immigration and Nationality Act of 1952). For ease of reference, both forms of relief are referred to throughout this opinion as "212(c) relief."

4. This new form of discretionary relief reflected the change in nomenclature brought about by the IIRIRA. *See Evangelista v. Ashcroft,* 359 F.3d 145, 147 n. 1 (2d Cir.2004) (discussing IIRIRA's replacement of "deportation" with "removal" as the term of art used to refer to the removal of admitted aliens from this country). For ease of reference, we will refer to both forms of proceedings as "deportation" proceedings throughout this opinion.

The 1996 amendments to § 212(c) were subsequently deemed by the Attorney General to apply to all pending and future deportation proceedings. *See Matter of Soriano,* 21 I. & N. Dec. 516 (Op. Atty Gen. Feb. 21, 1997); *see also Matter of Yeung,* 21 I. & N. Dec. 610, 1996 WL 683917 (BIA 1996). Thus, during the years immediately following the passage of AEDPA and IIRIRA, aggravated felons facing deportation were routinely deemed ineligible for § 212(c) relief. Our Court reversed part of the Attorney General's approach in 1998, and held that .§ 440(d) was not intended to apply retroactively to immigration proceedings pending at the time of its enactment. *Henderson v. INS,* 157 F.3d 106, 130 (2d Cir.1998). In 2000, in *St. Cyr v. INS,* 229 F.3d 406 (2d Cir. 2000) ("*St. Cyr I* "), our Court further limited the sweep of AEDPA and IIRIRA. We concluded that the Acts' restrictions on discretionary relief imposed retroactive consequences on those who had pled guilty prior to the laws' enactment. *Id.* at 418. A retroactive effect of this sort, we held, was only permitted under *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), if Congress clearly intended it. *St. Cyr I,* 229 F.3d at 413. Finding no such intent in the statutes, we ruled that the relevant aliens were potentially eligible for § 212(c) relief. *Id.* at 420. *St. Cyr* was subsequently affirmed by the Supreme Court. *INS v. St. Cyr,* 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("*St. Cyr II* ").

Following the decisions in *Henderson* and *St. Cyr I* and *II,* many aliens who had been denied the opportunity to apply for § 212(c) relief under *Soriano* or *Yeung* petitioned the Board of Immigration Appeals ("the BIA" or "the Board") to reopen their immigration proceedings. In addition, the BIA itself, *sua sponte,* reopened the proceedings of some aliens, who now appeared to be eligible for § 212(c) relief. The Petitioners are among those who sought, or were *sua sponte* granted, reopening of their immigration proceedings after *Henderson* or *St. Cyr.*

**B. Anthony Milton Edwards**

*i. · Facts*

Petitioner Anthony Milton Edwards ("Edwards") entered the United States as a lawful permanent resident in 1986. Prior to his incarceration on the charges forming the underlying basis for his deportation order, he was lawfully employed for many years, and served in the United States military. Petitioner Edwards has strong family ties in the United States, with both of his parents, as well as all of his siblings, residing here.

Edwards was arrested on· August 4, 1992 on drug-related charges. On October 26, 1992, he pleaded guilty to, and was convicted of, attempted criminal sale of a controlled substance in the third degree. Shortly thereafter, on January 25, 1993, he was convicted, again upon a plea of guilty, of criminal sale of a controlled substance in the second degree. Edwards was committed to the custody of the New York Department of Correctional Services ("NY-DOCS") on March 3, 1993, with 204 days of jail time credit. Edwards was subsequently paroled into the custody of the Immigration and Naturalization Service[5] ("the Service" or "the INS") on August 11,

---

**5.** As of March 1, 2003, the INS ceased to exist as an agency under the umbrella of the Department of Justice. Its immigration enforcement functions thereafter were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, § 441, 116 Stat. 2135, 2192 (Nov. 25, 2002). For ease of reference and because the agency was known as the INS at the time of the events pertinent to this appeal, this opinion refers to the respondent as the INS.

1997. On July 27, 2000, Edwards was recommitted to the custody of the NY-DOCS for violating the conditions of his parole. Edwards was re-paroled into the custody of the INS on October 18, 2000. He is currently detained by the Service in Leesport, Pennsylvania.

On June 22, 1995, while Edwards remained in state custody, the INS initiated deportation proceedings against him. Following a deportation hearing, an Immigration Judge ("IJ") found Edwards deportable, but granted him a § 212(c) waiver. The IJ noted that Edwards had strong family ties in the United States, had adduced significant evidence of rehabilitation, and had been legitimately employed prior to his incarceration. The IJ concluded that Edwards had demonstrated "outstanding equities" and found "specifically that it would be in the best interest of the United States to allow [Edwards]...to remain here...."

The INS appealed to the BIA, which on May 21, 1997, reversed. The BIA found that Edwards was ineligible for § 212(c) relief based on AEDPA § 440(d) and the Attorney General's opinion in *Matter of Soriano*, 21 I. & N. Dec. at 534. Petitioner Edwards's motion for reconsideration of the Board's decision was denied on July 30, 1997. At that time, Edwards had not yet served five years in prison on his aggravated felony offenses.

Three and half years later, the BIA reopened Petitioner Edwards's deportation proceedings *sua sponte*.[6] Noting our Court's intervening decision in *Henderson*, the Board determined that it would be appropriate to remand Petitioner Edwards's proceedings for further consideration of his eligibility for § 212(c) relief. In so doing, the Board stated in part that:

> barring any additional criminal activity on the part of the respondent, we would agree with the Immigration Judge's original decision to grant the respondent the requested relief. However, due to the length of time that has elapsed since the Immigration Judge's decision, based primarily on the great strides the respondent has made towards rehabilitation, we will remand the record for either party to present additional evidence regarding the exercise of discretion in this case.

*Edwards*, No. A40 231 511—Napanoch at 2.

On remand, however, Edwards's proceedings focused exclusively on whether he met the statutory eligibility criteria for § 212(c) relief. In response to questions by the IJ, Edwards's lawyer conceded that Edwards had, by the time of the remanded proceedings, served more than five years in prison on one or more aggravated felony offenses.[7] The IJ, as a result, concluded

---

**6.** There is some uncertainty in the record as to whether the Board's decision was in fact rendered *sua sponte*. In one part of its decision the Board indicates that it will "reopen these proceedings *sua sponte*," but in another states that "[t]he respondent now files a new motion to reopen [his] proceedings." *Matter of Edwards*, No. A40 231 511—Napanoch (BIA Jan. 4, 2001). Because resolution of this conflict is not necessary for the purposes of reaching Petitioner Edwards's claims, we will not address it further.

**7.** It remains an open question in this circuit whether time accrued in pretrial detention

should be counted in calculating whether the five year bar applies. *See, e.g., Jackson v. Ashcroft*, No. 02–CV–1739, 2003 WL 22272593 at *4 n. 4 (D.Conn. Sept.28, 2003). Assuming that Petitioner Edwards's pretrial detention time did *not* contribute to his accrual of incarceration for the purposes of § 212(c), he would not necessarily have accrued the requisite five years. Because neither party contests the IJ's finding that Edwards has accrued more than five years' imprisonment, we do not address the issue here.

that Edwards was ineligible for § 212(c) relief. On appeal, the BIA affirmed, rejecting Edwards's request to "be returned to the position that he was in at the time th[e] Board rendered [its]...decision on May 21, 1997." *Matter of Edwards,* No. A40 231 511—New York at 2 (BIA Nov. 30, 2001).

### ii. Habeas Petition

Petitioner Edwards subsequently filed a *pro se* habeas petition in the Eastern District of New York pursuant to 28 U.S.C. § 2241. In his petition, he alleged, among other things, that he had already been awarded § 212(c) relief, and that the time he served on his parole violation should not be counted towards the five year bar. The government responded that the additional time served by Edwards was properly counted towards the five year bar, and that Edwards was, as such, currently ineligible for § 212(c) relief.

In an opinion dated March 28, 2003, the district court (Gleeson, *J.*) denied Edwards's petition for a writ of habeas corpus. *Edwards v. INS,* No. 02–CV–3309, 2003 WL 1786483 (E.D.N.Y. Mar.28, 2003). Judge Gleeson concluded that, under this Court's decision in *Buitrago–Cuesta v. INS,* 7 F.3d 291 (2d Cir.1993), all prison time accrued by Edwards must be counted towards the five year bar. *Id. at* \*3. As a result, he found that the BIA had not erred in finding Edwards ineligible for § 212(c) relief. *Id. at* \*4.

Edwards filed a timely notice of appeal on April 18, 2003.

### C. Eva Trinidad Falconi

#### i. Facts

Petitioner Eva Trinidad Falconi ("Falconi") entered the United States as a visitor in 1980, and was granted lawful permanent resident ("LPR") status in 1984. Falconi is married to an American citizen and has a seventeen-year-old American-born son. Prior to her arrest, Falconi had lived legally in the United States for over fifteen years.

On April 19, 1995, Falconi was arrested on narcotics-related offenses, and committed to pre-trial detention. On April 9, 1996, she pleaded guilty to, and was convicted of, conspiring to possess cocaine with intent to distribute. Falconi was sentenced to 151 months' imprisonment, which she is currently serving at the Philadelphia Federal Detention Center.

Shortly after Falconi's conviction, the INS initiated deportation proceedings against her. Beginning in September 1997, a series of removal hearings were conducted before an IJ at the Danbury Federal Correctional Institution, where Falconi was then incarcerated. At the final hearing, on Feburary 18, 1998, Falconi requested § 212(c) relief. The IJ rejected her request without reaching the merits, finding that Falconi was statutorily ineligible for relief under *Matter of Yeung,* 21 I. & N. Dec. at 613.

Falconi timely appealed the IJ's determination to the BIA. On October 25, 1999, the BIA dismissed her appeal, concluding that, under *Matter of Soriano* 21 I. & N. Dec. at 534, Falconi was ineligible for § 212(c) relief. At that time, Falconi had served less than five years in prison on her aggravated felony offense.

Falconi moved to reopen her deportation proceedings following the Supreme Court's decision in *St. Cyr II.* In her motion, she alleged, *inter alia,* that her application for § 212(c) relief should have been evaluated under pre-AEDPA and pre-IIRIRA law. By that time, however, Falconi had served more than five years in prison. The BIA, therefore, concluded that she had not demonstrated eligibility for § 212(c) relief, and, on that basis, denied her motion to reopen.

*ii. Habeas Petition*

Falconi filed a *pro se* habeas petition in the Eastern District of New York on March 4, 2002, pursuant to 28 U.S.C. § 2241. In her petition, Falconi alleged, among other things, that she should be a "potential candidate" for § 212(c) relief.

In an opinion dated November 26, 2002, the District Court (Trager, *J.*), granted Falconi's petition. *Falconi v. INS*, 240 F.Supp.2d 215, 219 (E.D.N.Y.2002). Judge Trager observed that, at the time that the IJ and BIA issued their decisions on Falconi's application for § 212(c) relief, she had served less than five years in prison. *Id.* at 218. "Thus, absent the Immigration Judge's and BIA's retroactive application of the AEDPA, Falconi would have been eligible to apply for INA § 212(c) discretionary relief." *Id.* Judge Trager concluded that Falconi should not be deprived of the opportunity to seek § 212(c) relief by the BIA and IJ's erroneous retroactive application of the AEDPA. *Id.* at 219. He accordingly remanded her § 212(c) petition to the EOIR for adjudication on the merits.

## II. DISCUSSION

### A. Ripeness

■ The INS argues as an initial matter that Petitioner Falconi's claims are not ripe for judicial review. Relying on our decision in *Simmonds v. INS*, 326 F.3d 351 (2d Cir.2003), the Service suggests that because Falconi will not become eligible for release until 2006, her claims would be better adjudicated at a later date. The Service points out that the immigration laws have been "especially changeable in recent years," and notes that subsequent changes in the law might require revisiting Falconi's claims prior to her actual deportation. *See Simmonds*, 326 F.3d at 360. While the immigration laws have indeed been highly changeable in the past decade, we disagree that such mutability renders Falconi's claims unripe for review at this time.

■ As we held in *Simmonds*, the variability of the immigration laws is a proper consideration in evaluating the prudential ripeness of an alien's claims. *Id.* And, where an alien, like Simmonds, faces release (and deportation) at the earliest a decade in the future, this variability may well reduce the "fitness" of the issues raised by the alien for review. *See id.* Here, however, Petitioner Falconi may be released and deported within the next two years. In a system where adjudication of Petitioner Falconi's claims could itself take well over two years, we cannot conclude that the potential for legal changes within this period renders Falconi's claims unfit for review.

The other component of the ripeness inquiry, hardship, is also manifestly present here. Were we to require Petitioner Falconi to refile her claims at a later date, such claims would likely not be finally adjudicated prior to her earliest possible release date. *Cf. id.* at 360–61 & n. 10 (making clear that Simmonds's claims might become ripe closer to his release date). As such it is more than possible that Petitioner Falconi would face deportation (if her deportation was not stayed) or mandatory detention (if her deportation was stayed) while her claims were being adjudicated. *Cf. id.* (noting that post-release detention or deportation could constitute hardship).

We therefore conclude that Petitioner Falconi's claims are ripe for judicial review.

### B. The Merits

On the merits, both Petitioners Falconi and Edwards raise two claims. First, they

assert that as a matter of statutory construction, an alien's eligibility for § 212(c) relief should be determined by reference to his or her status as of the time of the entry of an administratively final order of deportation. Petitioners secondarily argue that our Court, in the exercise of its equitable powers, should afford Petitioners *nunc pro tunc* relief.[8] Because we believe that Petitioners' second contention is correct, we need not ultimately decide the merits of their first (statutory) argument.

**i. Statutory Issue**

Under the discretionary relief regime in existence at the time of Petitioners' guilty pleas, aliens were required to demonstrate three criteria in order to be statutorily eligible for § 212(c) relief: 1) that they possessed lawful permanent resident status; 2) that they had been lawfully domiciled in the United States for seven or more years; and 3) if they had been convicted of an aggravated felony or felonies, that they had served less than five years in prison on those aggravated felony offenses. *See* 8 U.S.C. § 1182(c) (1995) (repealed 1996).[9] Because all three of these criteria may change over time, the question of *when* an alien's eligibility is determined, and whether an alien may *become* eligible or ineligible for § 212(c) relief, has long been a matter of considerable attention in both our and the BIA's § 212(c) jurisprudence.

Were we to look only at our decisions concerning when an alien's eligibility under the three above-mentioned categories is to be determined, we might well conclude that whether five years' imprisonment has been served should be decided as of the date on which each alien's final order of deportation was entered. *Compare Lok v. INS*, 681 F.2d 107, 110 (2d Cir.1982) (concluding that time ceases to accrue for the purposes of § 212(c)'s seven years of lawful domicile requirement after the EOIR's determination of deportability becomes final, but relying on a rationale that appeared to be limited to the context of the seven years requirement), *with Buitrago–Cuesta v. INS*, 7 F.3d 291, 296 (2d Cir. 1993) (applying case law addressing the accrual of time towards the seven years domicile requirement to the five years imprisonment context without mentioning the specific rationale relied on in *Lok* ).

INS regulations, moreover, could also be read to support this position. *See, e.g.,* 8 C.F.R. § 3.2(c)(1) (1996) (recodified at 8 C.F.R. § 1003.2(c)(1)), which states, broadly, that "a motion to reopen proceedings for consideration or further consideration of an application for relief under section 212(c) of the Act may be granted if the alien demonstrates that he or she *was statutorily eligible for such relief prior to the entry of the administratively final order of deportation* " (emphasis added).[10] The relevant part of section 3.2(c)(1) was seemingly added to the regulation as a result of our decision in *Vargas v. INS*, 938 F.2d 358 (2d Cir.1991). *See* Executive

---

**8.** Petitioners also suggest that the five year bar provision is akin to a statute of limitations which can be equitably tolled. We express no opinion on the merits of this claim.

**9.** All parties agree that, under *St. Cyr*, the version of 8 U.S.C. § 1182(c) in effect at the time of Petitioners' guilty pleas should have been applied in Petitioners' original deportation proceedings. *See St. Cyr II*, 533 U.S. at 326, 121 S.Ct. 2271.

**10.** 8 C.F.R. § 1212.3(f), the regulation that the INS argues supports *its* position (discussed *infra* ), when read in conjunction with yet another INS regulation, 8 C.F.R. § 1.1(p) (also found at 1001.1(p)), seems to us, rather, to support the conclusion that an alien's eligibility for § 212(c) relief should be determined by reference to the alien's status as of, or prior to, the time of entry of the alien's final order of deportation.

Office for Immigration Review; *Motions and Appeals in Immigration Proceedings,* 61 Fed.Reg. 18,900–01 at 18,901 (Apr. 29, 1996). While *Vargas* dealt only with § 212(c)'s "lawful permanent resident status" requirement, *see Vargas,* 938 F.2d at 360, the regulation enacted by the INS uses much more sweeping language, language that seems to adopt Petitioners' suggested approach to determining statutory eligibility.

■ Nevertheless, the INS is currently forcefully contending that the five years imprisonment bar continues to accrue indefinitely, and precludes § 212(c) relief at whatever point the five years have been reached. And this position inevitably raises the question of whether *Chevron* and *Auer* deference should be applied.[11] But, in addition to the usual reasons for questioning the applicability of either form of deference, the cases before us raise another possible, and complicated, ground for declining deference. We have recently held that an erroneous denial of the opportunity to apply for § 212(c) relief may constitute a due process violation. *See United States v. Copeland,* 376 F.3d 61, 70–71 (2d Cir.2004); *United States v. Sosa,* 387 F.3d 131, 138 (2d Cir.2004). If deference to an agency interpretation serves to cast doubt on the constitutionality of a statute, the question of whether courts should afford deference, and bite the constitutional bullet, is anything but easy. *Cf. AFL–CIO v. Federal Election Commission,* 333 F.3d 168, 175, 179 (D.C.Cir.2003) (concluding that the statute before the court was ambiguous, but rejecting the relevant agency's interpretation in order to avoid constitutional concerns).

Fortunately, none of the above issues need to be resolved today. Petitioners have offered a second and independent argument as to why they are currently potentially eligible for § 212(c) relief. That argument, based on the equitable remedy of *nunc pro tunc,* has merit and suffices to decide the cases before us. It, therefore, permits us to leave unsettled the aforementioned statutory interpretation issues.

### ii. *Nunc Pro Tunc Relief*

■ The equitable remedy of *nunc pro tunc* (literally "now for then") relief has a long and distinguished history in the field of immigration law. For more than sixty years, the Attorney General and the Board of Immigration Appeals have recognized its importance in mitigating potentially harsh results of the immigration laws. *See Matter of L-,* 1 I. & N. Dec. 1 (A.G.1940) (holding, in the first reported I & N Decision, that an alien in deportation proceedings could be awarded relief under the predecessor statute to § 212(c), because the Attorney General could exercise his discretion *nunc pro tunc* ); *see also Matter of T-,* 6 I. & N. Dec. 410, 413 (BIA 1954) (applying the principle established in *Matter of L-*). When a matter is adjudicated *nunc pro tunc,* it is as if it were done as of the time that it should have been done. *See Matter of A-,* 3 I. & N. Dec. 168, 172–73 (BIA 1948) (remedying a prior failure to waive grounds of exclusion by entering an order *nunc pro tunc* ).

The use of the *nunc pro tunc* doctrine has not been limited to the administrative bodies charged with executing the immigration laws. Courts, also, have relied on

---

**11.** *Chevron* deference is the deference afforded to an agency's interpretation of a statute it is charged with administering. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Auer* deference is the deference we afford to an agency's interpretation of its own regulations. *See Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

the doctrine, in order to return aliens to the position in which they would have been, but for a significant error in their immigration proceedings. *See, e.g., Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993); *see also Castillo–Perez v. INS*, 212 F.3d 518, 528 (9th Cir.2000). While our circuit has not previously explicitly invoked the *nunc pro tunc* doctrine in ordering relief for BIA error, we have, in substance, awarded just such relief where equity required. *See Drax v. Reno*, 338 F.3d 98, 118–19 (2d Cir.2003); *see also Iavorski v. INS*, 232 F.3d 124, 130 n. 4 (2d Cir.2000) (noting that *nunc pro tunc* relief has long been available to remedy error in immigration cases).

■ It is thus beyond question that an award of *nunc pro tunc* may, in an appropriate circumstance, be granted as a means of rectifying error [12] in immigration proceedings. Whether it should be used in the cases before us depends on a number of subsidiary questions to which we now turn.

*a) Statutory Bar*

■ A court may not award equitable relief in contravention of the expressed intent of Congress. *See INS v. Pangili-* *nan*, 486 U.S. 875, 883–85, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988). As such, were we to conclude that Congress meant to preclude the use of *nunc pro tunc* relief in the context before us, we would necessarily be forced to reject Petitioners' *nunc pro tunc* arguments. The INS contends that Congress did in fact intend to bar the use of *nunc pro tunc* relief in the instant circumstances. It suggests that 8 U.S.C. § 1182(c) (1995) (repealed 1996), which sets out the statutory requirements for § 212(c) eligibility, evinces a clear intent that *all* aggravated felons who have accrued five or more years' imprisonment be deemed ineligible for § 212(c) relief. We disagree.

The BIA has, through much of § 212(c)'s history, explicitly deemed it appropriate to award § 212(c) waivers *nunc pro tunc*. *See, e.g., Matter of A-*, 3 I. & N. Dec. at 172–73.[13] And, despite multiple amendments and a recodification of the statute, Congress has not expressly countermanded this long-standing practice. *See, e.g, Matter of S-*, 6 I. & N. Dec. 392, 394–96 (BIA 1954), *approved* 6 I. & N. at 397 (A.G.1955) (reviewing the legislative history of the Immigration and Nationality Act of 1952, and concluding that Congress, in

**12.** The INS suggests that the doctrine of *nunc pro tunc* may only be used to correct inadvertent errors, and not to remedy "a defect in a judgment order or decree which expressed exactly the intention of the [agency] at the time it was made". *Fierro v. Reno*, 217 F.3d 1, 5 (1st Cir.2000) (describing the limits of *nunc pro tunc* authority under Massachusetts law). Whatever the merits of that position may be in other areas of the law, it is clearly not the approach that has been taken in the immigration context. *See, e.g., Batanic*, 12 F.3d at 667–68; *Castillo–Perez*, 212 F.3d at 528; *see also Drax*, 338 F.3d at 118–19; *Snajder v. INS*, 29 F.3d 1203, 1208 n. 12 (7th Cir.1994).

**13.** The Board's opinions addressing Petitioner Edwards's and Falconi's § 212(c) claims do not explicitly retreat from this position. On the contrary, the BIA's decision in Petitioner Edwards's case (while admittedly opaque) suggests that the Board may even have understood an award of *nunc pro tunc* relief to be a possibility, but nevertheless declined to afford such relief. *Matter of Edwards*, No. A40 231 511—New York at 2 (BIA Nov. 30, 2001).

On appeal, of course, the INS has vigorously argued that 8 U.S.C. § 1182(c) precludes an award of *nunc pro tunc* relief. No deference is due to this litigation posture. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Such deference would be particularly inappropriate where, as here, the position is contrary to a long-standing agency practice of affording § 212(c) relief *nunc pro tunc*.

recodifying the Seventh Proviso as § 212(c), did not intend to preclude *nunc pro tunc* awards of relief). Congressional reenactments, when made in the light of administrative interpretations of this kind,[14] go a long way to precluding the INS's current contention. *See, e.g., Isaacs,* 865 F.2d at 472–75. They do, that is, unless the reenactments themselves evince, through changes in 8 U.S.C. § 1182(c), an intent to reject the prior administrative construction.

■ The 1990 amendments to § 212(c), which added the five year bar requirement, do not demonstrate any such intent. *See* Immigration Act of 1990, Pub.L. No. 101–649, § 511(a), 104 Stat. 4978, 5052 (1990) (enacting the five year bar). While clearly the 1990 amendments were meant to limit the circumstances in which aggravated felons could be afforded § 212(c) relief, *see Giusto v. INS,* 9 F.3d 8, 10 (2d Cir.1993) (per curiam), there is no evidence that Congress, in enacting them, intended to preclude otherwise appropriate awards of *nunc pro tunc* relief. Certainly, the language of the amendments is not the type of categorical language, that, in other circumstances, has been found to bar an award of equitable relief. *Cf. Pangilinan,* 486 U.S. at 884–85, 108 S.Ct. 2210 (discussing the multiple explicit statutory provisions that would have to be disregarded in order to afford equitable relief in that case). Nor have we located legislative history suggesting that Congress, when it passed the five year bar, meant to incapacitate the courts from remedying serious INS error. *See generally Giusto,* 9 F.3d at 10 (noting that there is relatively little legislative history explicitly clarifying Con-

gress's intent in enacting IMMAct § 511). *Cf. United States ex rel. Klonis v. Davis,* 13 F.2d 630, 631 (2d Cir.1926) (noting that it was evident from both the language and legislative history of the statute at issue that the act did not allow determinations to be made *nunc pro tunc* ).

We conclude that an award of *nunc pro tunc* relief, if otherwise appropriate, would not contravene 8 U.S.C. § 1182(c).

*b) When Nunc Pro Tunc Relief Should Be Afforded*

■ Where *nunc pro tunc* relief is not barred by statute, courts have defined the circumstances in which it is appropriate to award such relief in broad and flexible terms. Thus, courts have suggested that *nunc pro tunc* relief "should be granted or refused, as justice may require" *Mitchell v. Overman,* 103 U.S. 62, 65, 26 L.Ed. 369 (1882), and that such relief should be available whenever necessary "to put the victim of agency error 'in the ... position [he or she] would have occupied but for the error.'" *Ethyl Corp. v. Browner,* 67 F.3d 941, 945 (D.C.Cir.1995) (quoting *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 206–07 (D.C.Cir.1984)). Applying this framework, courts have concluded that—where an agency error would otherwise be irremediable, and where the plaintiff has been deprived of a significant benefit—"fairness to the parties," *Weil v. Markowitz,* 829 F.2d 166, 175 (D.C.Cir.1987), dictates that the error be remedied *nunc pro tunc.* *See e.g., Ethyl Corp.,* 67 F.3d at 945; *see also Batanic,* 12 F.3d at 667–68.

■ In the immigration context, we believe that these standards mandate that an award of *nunc pro tunc* relief ordinarily

14. Indeed, these cases present a stronger than usual justification for applying the "reeanctment" rule, *see Isaacs v. Bowen,* 865 F.2d 468, 472–75 (2d Cir.1989), in light of the fact that Congress was clearly aware, in reenact-ing the Seventh Proviso as § 212(c), of the BIA practice of affording Seventh Proviso relief *nunc pro tunc.* *See Matter of S-,* 6 I. & N. Dec. at 394–96.

be available where agency error would otherwise result in an alien being deprived of the opportunity to seek a particular form of deportation relief.[15] *See, e.g., Batanic,* 12 F.3d at 667 (ordering *nunc pro tunc* relief, where such relief was required in order to allow an alien to apply for asylum). As our Court has noted, "[d]eportation usually has very serious consequences." *Copeland,* 376 F.3d at 72. In effect, for many long-term residents of our country, it may constitute the equivalent of "banishment or exile." *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948). Therefore, where agency error has prevented an alien from seeking deportation relief, "justice...require[s]," *Mitchell,* 103 U.S. at 65, that the agency rectify that error—and that it do so, if necessary, by means of *nunc pro tunc* relief.

The government suggests that we should impose an additional prerequisite—that the denial of deportation relief (or other underlying procedural flaw) rise to the level of a due process violation—before affording *nunc pro tunc* relief.[16] And, admittedly, this is the approach we have taken in another immigration law context. As we recently held in *United States v. Copeland,* 376 F.3d 61 (2d Cir.2004), in order for a defendant to obtain dismissal of an indictment in an illegal reentry prosecution, the erroneous denial of § 212(c)

relief (in the context of the underlying deportation proceeding) must rise to the level of a due process violation. As a result, the defendant, in order to show the requisite "fundamental unfairness," must demonstrate that there is a "reasonable probability" that he would have been afforded relief, had the opportunity to apply for relief not been erroneously withheld. *Id.* at 73–74.

But, what is at stake in the illegal reentry context is *not* the restoration of the defendant's deprived opportunity to apply for § 212(c) relief. Rather, in the illegal reentry context, the defendant is asking the court to dismiss the indictment against him (and, in many instances, thereby to reverse his criminal conviction). As such, the courts must necessarily play the role of prognosticator, and divine whether, had the error not occurred, the defendant would likely have obtained immigration relief. The option of remanding to the agency, to know what in fact would have happened, but for the agency error, is not, in that context, available to the reviewing courts.

Here, in contrast, the situation is entirely different. The Petitioners have been deprived of an opportunity to apply to the EOIR for a form of relief that, in a significant percentage of cases, is granted. *See St. Cyr II,* 533 U.S. at 296 n. 5, 121 S.Ct. 2271 (citing statistics indicating that 51.5%

---

**15.** Of course agency error would not "result" in an alien being deprived of the opportunity to seek deportation relief where the alien would have independently been barred *at the time* of the error from applying for the form of relief at issue. In addition, in some individual cases, an otherwise appropriate award of *nunc pro tunc* relief may well be rendered *in*appropriate by the existence of unclean hands, or other equitable factors. We express no opinion on how and when such factors may limit the availability of *nunc pro tunc* relief, as the government has not contended that they apply to the cases before us today.

**16.** The government's briefs, filed before our recent decisions in *Copeland* and *Sosa,* go so far as to argue that *nunc pro tunc* relief would be inappropriate in *any* case involving the erroneous denial of § 212(c) relief, because erroneous denial of the opportunity to seek § 212(c) relief can never rise to the level of a constitutional violation. This specific argument is foreclosed by our recent illegal reentry decisions. *See Sosa,* 387 F.3d at 138; *Copeland,* 376 F.3d at 70–71.

of the § 212(c) applications in which a final decision was reached between 1989 and 1995 were granted). To the extent that the record does not clearly indicate whether Petitioners would have been granted such relief, we see no reason why *our* Court, as opposed to the EOIR, should decide the question. Our role is limited to the restoration to Petitioners of the opportunity to present their arguments to the EOIR, which may then decide whether Petitioners are, or are not, deserving of relief.[17]

▪ We therefore hold that, to obtain *nunc pro tunc* relief, Petitioners need only demonstrate that they were erroneously denied the opportunity to apply for § 212(c) relief, and that, but for *nunc pro tunc* relief, this denial would be irremediable.

### III. CONCLUSION

▪ For the foregoing reasons, we hold that an award of *nunc pro tunc* relief is the appropriate remedy for the aliens before us, both of whom accrued more than five years' imprisonment subsequent to the legally erroneous denial of their § 212(c) applications.[18] In Petitioner Falconi's case, No. 03–2104, we affirm the district court. In Petitioner Edwards's case, No. 03–2292, we reverse and remand to the district court with instructions to grant the writ. Given the record in Petitioner Edwards's case—and specifically the fact that both the IJ and the BIA indicated that, had this case been decided at the relevant time, § 212(c) relief would have been appropriate—we see no reason why he should undergo further proceedings before the EOIR. Therefore, the writ should mandate that the respondent take whatever administrative steps are necessary to grant Petitioner Edwards § 212(c) relief.

---

**17.** To the extent that further proceedings are necessary in order to afford Petitioners' relief, *see infra*, the agency must, of course, apply the same standards to Petitioners that they applied to all other § 212(c) applicants at the time that Petitioners were erroneously denied § 212(c) relief. As the BIA has observed, these standards involve balancing "the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf." *Matter of Marin*, 16 I & N Dec. 581, 584 (BIA 1978).

**18.** Both of the Petitioners before us accrued more than five years' imprisonment subsequent to the entry of an administratively final order of deportation. We express no views on whether an award of *nunc pro tunc* relief would be similarly warranted where the alien accrued more than five years imprisonment during the pendency of administrative appeals.